UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

WILLIAM ARMSTRONG,                                                  Plaintiff,

v.                                                     Civil Action No. 3:17-cv-260-DJH-CHL

CITY OF WEST BUECHEL and
RICHARD RICHARDS, individually and in
his official capacity as Mayor of the City of
West Buechel, Kentucky,                                       Defendants.

\* \* \* \* \*

## **MEMORANDUM OPINION AND ORDER**

William Armstrong was fired from his job as Director of Public Works for the City of West Buechel, Kentucky, after he sent a letter to West Buechel Mayor Rick Richards complaining of racial discrimination. He sued Richards and the City, alleging discrimination and retaliation under state and federal law. (Docket No. 1) The defendants have moved for summary judgment, arguing that Armstrong lacks evidence to support any of his claims. (D.N. 40) After careful consideration, the Court will grant summary judgment as to Armstrong's discrimination claims but deny the motion as to Armstrong's retaliation claims.

I.

Armstrong, who is African American, worked for the City of West Buechel from August 2012 until August 2015. During that time, City Council member Joe Mattingly twice used the word "n\*\*\*\*r" in Armstrong's presence and addressed him as "boy" on one occasion.[1] (D.N. 40-2, PageID # 162) On another occasion, Armstrong was "grabbed and pushed" by coworker Gerald

---

[1] Armstrong acknowledges that Mattingly's use of the word "n\*\*\*\*r" was not directed at him but rather "in reference to 'trash' that was being picked up from the ground." (D.N. 42, PageID # 433; *see* D.N. 40-2, PageID # 162 ("He wasn't referring to me. They were talking about people in the streets throwing trash."))

1

Chamberlain. (*Id.*, PageID # 165) In addition to these incidents of alleged discrimination, Armstrong claims that he was the only City employee who did not receive a raise in July 2015. (*Id.*, PageID # 167) Armstrong complained to Richards about Mattingly's use of the word "n****r," as well as the pushing incident. (*Id.*, PageID # 163, 165-66)

On August 20, 2015, Armstrong delivered the following letter to Richards:

To Mayor Richards

This letter is in regards to a concern of mine about my job with the City. Since your first day as Mayor I have shown my loyalty to you. I work hard and do whatever is required and you ask me to do, I came honestly to you and shared concerns I had about remarks made by one of the City Council members, but I feel that I am being punished for speaking up.

I just want to come to work and to do the job you appointed me to as "Director of Public Works," and to have an opportunity to run my department without outside interference.

Last week you texted me a[nd] told me not to come in to work until I heard from you again. Then, last Wednesday, you sent me a letter delivered by a WBPD officer to my home. I was not there at the time and the letter was delivered to my son. You asked me to be at City Hall at 9:30 AM last Thursday. I was there at 9:30.

I saw you in the kitchen, but you did not mention anything about the letter or the meeting. Ms. Marti told me you said for me to go out and clean up the City.

I am baffled that you texted me on Sunday telling me not to come in until you got back to me, then sending a letter to my home by a police officer and then ignoring me when I did exactly what you asked.

I feel I am being punished as I am having to use my personal vacation time to make up for the times you tell me to stay home. I feel I deserve to know what is going on.

I feel I am working in a very hostile environment, without any explanation from you about why. I am respectful to everyone and I believe that I deserve to be treated with respect in return.

There is a lot of gossip going around the neighborhood and City Hall, and I don't know what to believe. People are acting differently toward me with no explanation. What have I done to make you unhappy and to treat me this way?

> You asked me to keep notes of what I have done on the job, and I have done that.
>
> Please give me something in writing about my job with the City.
>
> Thanking you in advance.
>
> Vernon

(*Id.*, PageID # 218; *see id.*, PageID # 168)

On Wednesday, August 26, 2015, Armstrong received a text message from Richards advising him not to come in to work until he heard from Richards "on Friday or Monday." (D.N. 42-2, PageID # 536; *see* D.N. 40-2, PageID # 177) After a week or two passed with no further communication, Armstrong went to City Hall to speak to Richards and was told to turn in his keys and gas card. (D.N. 40-2, PageID # 177) At his deposition, Armstrong was shown a letter from Richards dated August 21, 2015, that read: "As of this date, your employment with the City is hereby terminated. Your final paycheck will be in the form of a paper check and will be available to you at City Hall once you have turned in your keys and any other City property." (*Id.*, PageID # 223; *see id.*, PageID # 171) Armstrong had not seen the letter prior to his deposition. (*Id.*, PageID # 171)

Armstrong asserts claims of race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2–2000e-3, and the Kentucky Civil Rights Act, Ky. Rev. Stat. § 344.040. (D.N. 1, PageID # 4-6) His discrimination claims rest on theories of disparate treatment and hostile work environment. (*See id.*, PageID # 4-5) Defendants seek summary judgment on all of Armstrong's claims. (D.N. 40)

## II.

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a); *see* 56(c)(1). The Court "need consider only the cited materials." Fed. R. Civ. P. 56(c)(3); *see Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014). For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The moving party bears the burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Armstrong's Title VII and KCRA claims are governed by the same standards. *See Montell v. Diversified Clinical Servs.*, 757 F.3d 497, 504 (6th Cir. 2014) (citing *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009); *Brooks v. Lexington-Fayette Urban Cty. Hous. Auth.*, 132 S.W.3d 790, 801-02 (Ky. 2004)) (retaliation); *Scott v. G & J Pepsi-Cola Bottlers, Inc.*, 391 F. App'x 475, 477 (6th Cir. 2010) (*Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000)) (hostile work environment); *Wills v. Pennyrile Rural Elec. Coop. Corp.*, 259 F. App'x 780, 782 (6th Cir. 2008) (citing *Smith*, 220 F.3d at 758) (disparate treatment). The Court will therefore address Counts I and II (disparate treatment and hostile work environment under Title VII and KCRA, respectively) and Counts III and IV (retaliation) together.

**A.     Disparate Treatment**

"To successfully prosecute a Title VII claim, 'a plaintiff must either provide direct evidence of discrimination or establish a prima facie case, which creates an inference of discrimination based on circumstantial evidence.'" *White v. Duke Energy Ky., Inc.*, 603 F. App'x 442, 446 (6th Cir. 2015) (quoting *Seay v. TVA*, 339 F.3d 454, 463 (6th Cir. 2003)). A prima facie case of racial discrimination requires the plaintiff to establish

> (1) [that] he was a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was professionally qualified for the position he held

4

at the time of the action; and (4) that he was either replaced by a person from outside the protected class or was treated differently from similarly situated employees outside the protected class.

*Id.* (citing *Clayton v. Meijer, Inc.*, 281 F.3d 605, 607 (6th Cir. 2002)).

The parties agree that the prima facie standard applies here. (*See* D.N. 40-1, PageID # 131-33; D.N. 42, PageID # 430-32) Only the final element is in dispute: Defendants argue that Armstrong cannot show that he was treated differently from similarly situated white employees. (*See* D.N. 40-1, PageID # 132-33) In response, Armstrong asserts that "all city employees received a raise in July 2015 except for him" and that "[w]hile other similarly situated employees received health insurance, Armstrong never received insurance because Kim Richard[s] kept Armstrong from obtaining it." (D.N. 42, PageID # 432 (citing Armstrong Dep.)) As an "example," Armstrong states that "Mark Lawson was provided insurance while Armstrong was not." (*Id.* (citing Mark Lawson Personnel File)) He concludes: "[A]ll of Armstrong's coworkers that received raises and insurance, clearly similarly situated employees were treated more favorably than Armstrong [sic]." (*Id.*)

"To support an inference of unlawful discrimination, comparable non-minority employees who received more favorable treatment than [the] plaintiff must be shown to be similarly situated [to the plaintiff] in all relevant respects." *Ayers-Jennings v. Fred's Inc.*, 461 F. App'x 472, 476 (6th Cir. 2012) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352-53 (6th Cir. 1998)). "Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated" for purposes of this element. *Hatchett v. Health Care & Ret. Corp. of Am.*, 186 F. App'x 543, 548 (6th Cir. 2006) (citing *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004)). While a plaintiff "need not demonstrate an exact correlation with the asserted comparable employees" and the "relevant aspects of employment

5

status" between plaintiffs and comparators may vary from case to case, *Ayers-Jennings*, 461 F. App'x at 476, Armstrong has made no showing whatsoever as to how any of his coworkers were similarly situated to him. Instead, he refers vaguely to "all city employees," "other similarly situated employees," and "coworkers that received raises and insurance." (D.N. 42, PageID # 432) The sole individual he names as an "example," Mark Lawson, is not otherwise identified or described in any way—Armstrong does not mention Lawson's job title, responsibilities, or even his race. (*Id.*) It thus is not clear that Lawson is "outside the protected class," much less that he is "similarly situated" to Armstrong. *White*, 603 F. App'x at 446. Because Armstrong has produced no evidence that he "was treated differently from similarly situated employees outside the protected class," *id.*, his disparate-treatment claim fails. *See Craig-Wood v. Time Warner NY Cable LLC*, 549 F. App'x 505, 510 (6th Cir. 2014) (affirming summary judgment for employer on disparate-treatment claims where plaintiff presented no evidence that comparator with same job title "was similarly situated in other relevant aspects such as seniority, productivity, profitability, or other non-discriminatory factors"); *McNeil v. Sonoco Prods. Co.*, 519 F. App'x 382, 383 (6th Cir. 2013) (per curiam) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992)) (affirming summary judgment for employer where plaintiff "failed to proffer any evidence that a similarly situated employee outside of his protected class was treated more favorably and instead relied—impermissibly—on argument and the allegations in his complaint").

**B.     Hostile Work Environment**

Armstrong has likewise failed to produce sufficient evidence to support his claim that he was subjected to a hostile work environment.

> A plaintiff establishes a prima facie case of racial discrimination based upon a hostile work environment by showing that (1) the plaintiff was a member of a protected class; (2) the plaintiff was subjected to unwelcome harassment; (3) the harassment was race-based; (4) the harassment unreasonably interfered with the

6

plaintiff's work performance by creating an environment that was intimidating, hostile, or offensive; and (5) the employer was liable for the harassing conduct.

*Scott*, 391 F. App'x at 477-78 (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007)). Here, only the unreasonable-interference element is at issue. (*See* D.N. 40-1, PageID # 133-35)

To satisfy the unreasonable-interference element, Armstrong "must present evidence showing that under the 'totality of the circumstances' the harassment was 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" *Scott*, 391 F. App'x at 478 (quoting *Clay*, 501 F.3d at 707). "Occasional offensive utterances do not rise to the level required to create a hostile work environment." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008)). Armstrong must show that the environment was both objectively and subjectively hostile, i.e., that the harassment complained of was "so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and [to] the actual victim." *Bradley v. Arwood*, 705 F. App'x 411, 417 (6th Cir. 2017) (citing *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006)).

Defendants observe that Armstrong only testified about a handful of relatively minor incidents: being addressed by Joe Mattingly as "boy" on one occasion, Mattingly's use of the word "n****r" twice in Armstrong's presence, and Gerald Chamberlain pushing him.[2] (*Id.*, PageID #

---

[2] According to Defendants, Armstrong admitted that the incident with Chamberlain was not racially motivated. (D.N. 40-1, PageID # 134) In the cited portion of Armstrong's deposition, however, Armstrong first stated that there was "[n]othing to do with race then at that point" but then testified that he told Richards that Chamberlain "didn't want to listen to a black guy that was younger than him telling him what to do. . . . [I]t was all racially motivated behind me being younger and me being black trying to tell him what to do." (D.N. 40-2, PageID # 166; *see also id.*, PageID # 165 ("I think that he didn't want to receive information from a young black guy, younger than he was."))

134) Armstrong's response identifies these incidents—his characterization of which is at times inconsistent with his explicit deposition testimony—as well as two others: Kim Richards's accusation of stealing and insubordination and the mayor's August 26, 2015 text message telling Armstrong not to return to work.[3] (D.N. 42, PageID # 433-34)

Because Armstrong produces no evidence suggesting that the latter two incidents were related to his race (*see id.*), the Court may not consider them. *See Williams*, 643 F.3d at 511 (explaining that for purposes of determining "whether an environment is 'hostile or abusive'" under the fourth element, "only harassment *based on the plaintiff's race* may be considered" (citations omitted)). And while clearly offensive, Mattingly's comments and the pushing incident with Chamberlain, taken together, were not so "severe or pervasive" as to create a hostile work environment under binding Sixth Circuit law.[4] *Scott*, 391 F. App'x at 478 (quoting *Clay*, 501 F.3d at 707); *see Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 351-52 (6th Cir. 2005) (affirming summary judgment for employer on claim of hostile work environment where plaintiff "alleged only three relatively isolated incidents"—two physical and one verbal—"over a period of approximately two and a half years"); *see also Williams*, 643 F.3d at 513 (finding supervisor's occasional racist statements—"for example, calling Jesse Jackson and Al Sharpton 'monkeys' and saying that black people should 'go back to where [they] came from'"—insufficiently severe or

---

[3] Armstrong asserts that "Mattingly routinely referred to or called Armstrong 'boy'" and that "Chamberlain would physically touch, push, and move Armstrong against his will—especially in the presence of Mayor Richard[s]." (D.N. 42, PageID # 433) In fact, the cited portions of Armstrong's deposition reveal that Mattingly addressed him as "boy" only once and that there was a single pushing incident, which occurred "in front of two police officers," not the mayor. (D.N. 40-2, PageID # 162, 165)

[4] While "the question of '[w]hether conduct is severe or pervasive is "quintessentially a question of fact,"' the Sixth Circuit has "affirmed grants of summary judgment" upon findings "that as a matter of law, the conduct complained of was not sufficiently severe or pervasive." *Clay*, 501 F.3d at 707 (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 596-97 (6th Cir. 2006)).

pervasive); *cf. Bradley*, 705 F. App'x at 423 (finding fourth prima facie element met where plaintiff presented evidence "portray[ing] an environment of almost daily harassment and belittling subordination that persisted and even intensified over a period of years, ultimately resulting in her termination"); *Jordan*, 464 F.3d at 596-97 (finding conduct sufficiently severe or pervasive where for more than a decade plaintiff was subjected to "various racial slurs, demeaning jokes and inflammatory graffiti, . . . isolation and segregation . . . and . . . disparate discipline and additional duties"). In any event, Armstrong has made no effort to demonstrate that the harassment "unreasonably interfered with [his] work performance," *Scott*, 391 F. App'x at 478; he offers only a conclusory assertion that "[t]he Defendant's harassment of Armstrong unreasonably interfered with his ability to do his job and created a hostile environment for which he experienced daily [sic]." (D.N. 42, PageID # 434) In sum, Armstrong has failed to produce the evidence necessary to support his hostile-work-environment claims, and summary judgment is appropriate on those claims as well.

**C.    Retaliation**

The failure of Armstrong's discrimination and hostile-work-environment claims does not affect his claims of retaliation, since "a violation of Title VII's retaliation provision can be found whether or not the challenged practice ultimately is found to be unlawful." *Horner v. Klein*, 497 F. App'x 484, 490 (6th Cir. 2012) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579-80 (6th Cir. 2000)); *see also Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015) ("Just as an employee is entitled to protection for opposition to employment practices that may not actually be unlawful under Title VII, an employee who opposes a hostile work environment need not prove that the environment he complained of was actually hostile . . . to receive protection from retaliation under Title VII." (citing *Johnson*, 215 F.3d at 579-80)). To

9

establish a prima facie case of retaliation, Armstrong must show that "(1) [h]e engaged in a protected activity; (2) h[is] 'exercise of such protected activity was known by the defendant[s]; (3) thereafter, the defendant[s] took an action that was "materially adverse" to [him]; and (4) a causal connection existed between the protected activity and the materially adverse action.'" *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).

Defendants challenge Armstrong's proof on the second and fourth elements of the prima facie case, asserting that Armstrong "has developed no direct or circumstantial evidence whatsoever that Defendants knew he was exercising his civil rights or that there was any causal connection between the protected activity and the termination of his employment." (D.N. 40-1, PageID # 136) In response, Armstrong points to his August 20, 2015 letter to Richards "complaining of disparate treatment and a hostile work environment," which preceded his firing by mere days.[5] (D.N. 42, PageID # 435) Defendants do not address the letter in their reply, instead merely repeating their assertion that Armstrong has failed to present evidence showing they knew of his protected activity or that there was a causal connection between that activity and Armstrong's termination. (*See* D.N. 43, PageID # 638-39)

Because Defendants do not dispute that Armstrong engaged in protected activity or suffered a materially adverse employment action, the Court will consider only the knowledge and causation elements. *See Rogers*, 897 F.3d at 775 (finding that employer "implicitly conceded" first and second elements by failing to make any argument as to either). Armstrong has met both.

---

[5] Armstrong refers to August 26, 2015, as the date of his termination. (D.N. 42, PageID # 435, 437) While the termination letter discussed during Armstrong's deposition was dated August 21, 2015 (*see* D.N. 40-2, PageID # 171), either date is close enough in time to Armstrong's August 20 letter to suggest a causal link between his complaint and his termination, as discussed below.

10

### 1. Defendants' Knowledge

Defendants' contention that they were not aware of Armstrong's protected activity is somewhat puzzling given that the August 20 letter was addressed to Richards in his capacity as mayor. (*See* D.N. 40-2, PageID # 218) Defendants do not dispute that Richards received the letter, which Armstrong testified that he delivered himself. (*Id.*, PageID # 168) It is likewise undisputed that Richards was the one who terminated Armstrong's employment. (*See id.*, PageID # 223). Because the evidence shows that "the official committing the adverse action ha[d] knowledge of the protected activit[y]," the knowledge element is met. *Brown v. City of Franklin*, 430 F. App'x 382, 386 (6th Cir. 2011) (citing *Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 343 (6th Cir. 1998)); *see also Larocque v. City of Eastpointe*, 245 F. App'x 531, 537 (6th Cir. 2007) (finding that "the City had knowledge, through its agents, of the protected conduct" where plaintiff "report[ed] perceived sexual harassment to her supervisor on . . . two occasions").

### 2. Causal Connection

Armstrong relies on the temporal proximity between his August 20 letter and his termination to show the required causal connection. (*See* D.N. 42, PageID # 436) "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Rogers*, 897 F.3d at 776 (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). Termination within one to five days of protected activity is "very close in time." *Id.* (citing *Seeger v. Cincinnati*, 681 F.3d 274, 283-84 (6th Cir. 2012)) (finding ten-week gap sufficiently close). Armstrong has therefore established a prima facie case of retaliation under Title VII and the KCRA.

### 3. Legitimate Nondiscriminatory Reason

The burden next shifts to Defendants "to produce evidence of a legitimate, nondiscriminatory reason" for Armstrong's firing. *Barrow*, 773 F. App'x at 261 (citing *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 538 (6th Cir. 2008)). Yet Defendants' only mention of the purported reason(s) is the following sentence in the "Statement of the Case" section of their supporting memorandum: "Defendants claim that Armstrong's employment with the City was terminated due to poor job performance and other legitimate reasons." (D.N. 40-1, PageID # 124; *see id.*, PageID # 136 (acknowledging burden but offering no evidence or argument as to legitimate nondiscriminatory reason)); D.N. 43, PageID # 638 (same)) Because Armstrong disputes the stated reasons (*see* D.N. 42, PageID # 437), Defendants' failure to present evidence supporting those reasons ends the inquiry and precludes summary judgment on Armstrong's retaliation claims. *See Barrow*, 773 F. App'x at 261; *cf. Rogers*, 897 F.3d at 777 ("HFHS has adduced evidence showing that Rogers's co-workers had raised concerns about her behavior, and thus satisfied its burden to articulate a legitimate, non-retaliatory reason for its decision to send Rogers to a fitness-for-duty exam and then offer her a transfer." (internal citation omitted)); *Yazdian*, 793 F.3d at 651 ("ConMed has asserted legitimate, nondiscriminatory motives for terminating Yazdian's employment—insubordination and 'unprofessional behavior.' Yazdian does not argue that ConMed's proffered reason is illegitimate. Yazdian must therefore establish that these stated reasons are pretext . . . ."); *Horner*, 497 F. App'x at 490 (finding that defendants carried their burden to show legitimate nondiscriminatory reason "by producing evidence that Horner's dishonesty and his violations of departmental policies warranted disciplinary action, including written writeups, suspension without pay, and demotion").

## III.

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1) Defendants' motion for summary judgment (D.N. 40) is **GRANTED** as to Armstrong's disparate-treatment and hostile-work-environment claims under Title VII and the KCRA (Counts I and II of the complaint). The motion is **DENIED** as to Armstrong's claims of retaliation (Counts III and IV).

(2) Pursuant to 28 U.S.C. § 636(b)(1)(A), this matter is **REFERRED** to Magistrate Judge Colin H. Lindsay for a status conference to be held within **twenty-one (21) days** of entry of this Order. Discussion during the conference shall include the parties' positions regarding a further settlement conference and possible referral of the case to the magistrate judge for trial and final disposition.

October 26, 2019

**David J. Hale, Judge**
**United States District Court**